**NETWORK APPAREL GROUP, LP, Plaintiff,**

v.

**AIRWAVE NETWORKS INCORPORATED, Defendant.**

Network Apparel Group, LP, Plaintiff,

v.

Apogee Telecom Inc., Defendant.

Network Apparel Group, LP, Plaintiff,

v.

Elauwit, LLC, Defendant.

Network Apparel Group, LP, Plaintiff,

v.

Pavlov Media, Inc., Defendant.

Clarus Data, Inc. d/b/a Korcett Holdings, Inc., KHI–TW, LLC, and Network Apparel Group, LP, Plaintiffs,

v.

Time Warner Cable Inc. and Time Warner Cable Texas, LLC, Defendants.

Civil Action No. 6:15–CV–00134–WSS–JCM, Civil Action No. 6:15–CV–00135–WSS–JCM, Civil Action No. 6:15–CV–00136–WSS–JCM, Civil Action No. 6:15–CV–00138–WSS–JCM, Civil Action No. 6:15–CV–00139–WSS–JCM

United States District Court, W.D. Texas, Waco Division.

Signed December 30, 2015

David Greer Henry, James L. Reed, Jr., Michael D. Ellis, Gray, Reed & McGraw, P.C., Houston, TX, John P. Palmer, Naman Howell Smith & Lee, Waco, TX, Russell Erin Jumper, Gray Reed, & McGraw, Dallas, TX, for Plaintiff.

James Norman Willi, Tracy J. Willi, Willi Law Firm, P.C., Austin, TX, for Defendant.

### *REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

JEFFREY C. MANSKE, UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE WALTER S. SMITH, JR., UNITED STATES DISTRICT JUDGE**

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C. § 636(b)(1)(c) and Rules 1(h) and 4(b) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

Before the Court is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ.P. 12(b)(6). Defs.' Mot. (ECF No. 10). The Motion has been fully briefed (Pl.'s Resp. (ECF No. 13) and Defs.' Reply (ECF No. 21)), and oral argument[1] was held on November 9, 2015. For the reasons that follow, the undersigned **RECOMMENDS** that Defendants' Motion be **GRANTED** with respect to all of the asserted claims of U.S. Patent No. 7,631,079.

## I. BACKGROUND

Plaintiffs are Clarus Data, Inc., d/b/a Korcett Holdings, Inc. ("Korcett") and Network Apparel Group, LP (collectively, "Network Apparel"). Network Apparel is the owner of U.S. Patent No. 7,631,079 ("the '079 Patent"), and Korcett is Network Apparel's related entity and licensor of the '079 Patent. Korcett provides managed Internet services to multi-dwelling units ("MDUs"), such as dormitories and apartment complexes. Korcett designs and installs network management systems that practice the claims of the '079 Patent. One of the '079 Patent's inventors, Dave Daugherty, is Korcett's CEO. Defendants are five companies, all providing computer networking services. Network Apparel filed suit against each Defendant individually alleging infringement of the '079 Patent. The cases were assigned to the undersigned for all purposes. Order Reassigning Case, ECF No. 6. The actions were then consolidated for pre-trial purposes. Order Consolidating Actions, ECF No. 17.

The '079 Patent is entitled "System and Method of Messaging and Obtaining Message Acknowledgement on a Network." '079 Patent (filed May 21, 2007). According to the Specification, the '079 Patent addresses a problem created by the tendency of email recipients to ignore and delete any emails emanating from unknown senders. *Id.* col. 1, ll. 25–29. This tendency "has made it difficult to communicate via a computer network with some individuals on the network, and to verify that a message was received." *Id.* col. 1, ll. 32–34. In the Abstract, the '079 Patent describes the claimed system and method as follows:

> The system allows messages to target individual end user devices and receive message acknowledgement from end users. The method allows the recipient of an individually targeted message to prevent service interruption or to be rewarded by acknowledging receipt of a message.

*Id.* at Abstract.

There are three independent claims in the '079 Patent: claim 1 is a system claim and claims 9 and 15 are method claims. Claim 1 is reproduced below:

1. A system for managing messaging on a limited-area network comprising:

a network management device attached to a wide area network;

a limited area network attached to said network management device, said limited area network capable of connecting network devices identified by a unique attribute to said network management device;

a controller attached to said network management device;

---

1. Citations to the hearing transcript are hereinafter referred to as "Tr."

wherein said controller authenticates a particular network device identified by its unique attribute;

wherein responsive to authenticating said particular network device identified by its unique attribute, said controller creates a first access rule within said network management device for said particular network device;

wherein said network management device provides a level of access to a wide area network from said limited area network to said particular network device pursuant to said first access rule;

wherein responsive to a message sent to said particular network device identified by its unique attribute, said controller creates a second access rule within said network management device for said particular network device;

wherein said second access rule limits access to the wide area network by said particular network device identified by its unique attribute more than said first access rule;

wherein said network management device provides a level of access to said wide area network from said limited area network pursuant to said second access rule until said message sent to said particular network device is acknowledged by a user of said particular network device; and

wherein responsive to said user acknowledging said message, said network management device provides a level of access to said wide area network from said limited area network pursuant to said first access rule.

'079 Patent col. 8, ll. 6–44.

Defendants jointly seek to dismiss Network Apparel's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that the '079 Patent is invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter. The Court held a hearing on Defendants' motion on November 9, 2015. At the hearing, Network Apparel presented a list of four terms with proposed definitions to be used for the purposes of the 12(b)(6) motion, which included "network management device," "controller," "limit," and " level of access to said wide area network." The Court has adopted Network Apparel's proposed definitions for the purposes of this motion and finds that a more extensive claim construction is not necessary prior to ruling. The substance of Network Apparel's proposed definitions will be discussed in Step Two of the *Mayo/Alice* analysis.

## II. RELEVANT LAW

Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

Section 101 also "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S. —, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, — U.S. —, 133 S.Ct. 2107, 2116, 186 L.Ed.2d 124 (2013)) (internal quotation marks and brackets omitted). "[T]he concern that drives this exclusionary principle [i]s one of pre-emption." *Alice*, 134 S.Ct. at 2354 (citing *Bilski v. Kappos*, 561 U.S. 593, 611–12, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010)). These categories are not patent-eligible because "they are the basic tools of scientific and technological work" "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs. Inc.*,

—— U.S. ——, 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012) (citations omitted). Allowing patent claims for laws of nature, natural phenomena, and abstract ideas "might tend to impede innovation more than it would tend to promote it[,]" thereby thwarting the primary object of the patent laws. *Id.* The Supreme Court has "repeatedly emphasized this ... concern that patent law not inhibit further discovery by improperly tying up the future use of" these building blocks of human ingenuity. *Id.* at 1301; *see also O'Reilly v. Morse,* 56 U.S. (15 How.) 62, 14 L.Ed. 601 (1853).

However, the Court has also recognized the need to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice,* 134 S.Ct. at 2354 (citation omitted). The Supreme Court recognized that, at some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo,* 132 S.Ct. at 1293. Thus, an invention is not rendered ineligible for patent simply because it involves a law of nature, natural phenomena, or abstract idea. *See Diamond v. Diehr,* 450 U.S. 175, 187, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981). Applications of such concepts "to a new and useful end" remain eligible for patent protection. *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). Thus, in applying the § 101 exception, the Court must distinguish between patents that claim the "building block[s]" of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. *Alice,* 134 S.Ct. at 2354 (citing *Mayo,* 132 S.Ct. at 1303, 1294).

In *Alice,* the Supreme Court identified a "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." 134 S.Ct. at 2355 (citing *Mayo,* 132 S.Ct. at 1296–97). This framework reflects the two-part analysis utilized by the Supreme Court in *Mayo.*

Under the *Mayo/Alice* test, a court must first ask if the claim is "directed to one of those patent-ineligible concepts"—a law of nature, natural phenomenon, or abstract idea. *Alice,* 134 S.Ct. at 2355. If it is, the court moves to the second step. At step two, the court asks "[w]hat else is there in the claims before us?" *Mayo,* 132 S.Ct. at 1297. To answer that question, the court considers the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application of the patent-ineligible concept. *Id.* at 1297–98. This analysis serves as a search for an " 'inventive concept' "—i.e., an element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294.

## III. ANALYSIS

### A. Ripeness and Burden of Proof

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss an action that fails to state a claim upon which relief may be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the [non-movant]." *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004)) (internal quotation marks omitted). To survive the motion, a non-movant must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955 (internal citations omitted) (parentheticals in original). "A claim has facial plausibility when the [non-movant] pleads factual content that allows the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

■ The Federal Circuit has confirmed that determining patent eligibility under § 101 is appropriate at the pleadings stage. "Issues of patent-eligible subject matter are questions of law." *Cyber-Source Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1369 (Fed.Cir.2011). *See, e.g., Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n,* 776 F.3d 1343, 1349 (Fed.Cir.2014) (affirming district court's resolution of a motion to dismiss at the pleading stage); *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 711 (Fed.Cir.2014) (*Ultramercial III* ) (Mayer, J., concurring) (affirming district court's decision granting motion to dismiss infringement claim for failure to state patent-eligible subject matter); *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1351 (Fed.Cir.2014) (affirming district court's decision to grant judgment on the pleadings based on § 101). "[S]ection 101 imposes 'a threshold test,' ... one that must be satisfied before a court can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C. § 112." *Ultramercial III,* 772 F.3d at 718 (Mayer, J., concurring) (citing *Bilski,* 561 U.S. at 602, 130 S.Ct. 3218). "[S]ubject matter eligibility is the primal inquiry, one that must be addressed at the outset of litigation." *Ultramercial III,* 772 F.3d at 717 (Mayer, J., concurring). The Federal Circuit's declaration on this point is rooted in sound policy. Addressing § 101 at the outset of litigation has "a number of salutary effects:" it "conserve[s] scarce judicial resources," "provides a bulwark against vexatious infringement suits," and protects the public at the outset from "patents that stifle innovation and transgress the public domain." *Id.* at 719–20.

■ Furthermore, in this case the § 101 inquiry is properly addressed prior to claim construction. "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction,* 776 F.3d at 1349 (citing *Ultramercial III,* 772 F.3d at 714–15); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1273–74 (Fed.Cir.2012) (finding that the district court did not err by declaring claims patent-ineligible at the pleading stage without first construing the claims or allowing the parties to conduct fact discovery and submit opinions from experts supporting their claim construction positions). However, completing claim construction prior to a § 101 analysis may be appropriate under certain circumstances. *See Bancorp,* 687 F.3d at 1273–74. For instance, "it will ordinarily be desirable—and often necessary—to resolve claim construction *disputes* prior to a [§ ] 101 analysis." *Id.* (emphasis supplied).

In a Supplemental Brief filed November 23, 2015, Network Apparel asserts that, under the standard applicable to a Rule 12 motion, in order to grant Defendants' Motion, "the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility," and

there exists at least a plausible reading of the '079 Patent that renders it eligible. Pl.'s Supp. Br. (ECF No. 43) at 4, citing *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1339 (Fed.Cir.2013) *(Ultramercial II),* vacated sub nom. *WildTangent, Inc. v. Ultramercial, LLC,* — U.S. —, 134 S.Ct. 2870, 189 L.Ed.2d 828 (2014); *Affinity Labs of Tex., LLC v. Amazon.com, Inc.,* No. 6:15–CV–0029–WSS–JCM, 2015 WL 3757497, at *5 n. 4 (W.D.Tex. June 12, 2015) *(Affinity I)*; and *BASCOM Global Internet Servs., Inc. v. AT & T Mobility LLC,* 107 F.Supp.3d 639 (N.D.Tex.2015), appeal docketed, No. 15–1763 (Fed. Cir. June 19, 2015).

Network Apparel's argument is unavailing. As an initial matter, Network Apparel relies on language from the Federal Circuit's decision in *Ultramercial II,* 722 F.3d at 1339, a decision that was subsequently vacated by the Supreme Court. For additional support, Plaintiff cites to a footnote in the undersigned's opinion in *Affinity I.* In *Affinity I,* and in this opinion the undersigned cited this language from *Ultramercial II* —along with more than a dozen other cases—to illustrate the split among the courts as to whether the appropriate evidentiary standard on a § 101 motion is clear and convincing evidence. *See* n. 2. The undersigned did not, as Network Apparel suggests, adopt the proposition that a Rule 12 motion may be granted in one circumstance: when the *only* plausible reading of the patent reflects clear and convincing evidence of ineligibility. Finally, Plaintiff cites to *BASCOM Global Internet Servs., Inc.,* a district court decision invalidating a patent claiming a system and method for filtering Internet content. In that case, the District Court for the Northern District of Texas also cites the language from *Ultramercial II,* and for the same reason this Court did—to support its declaration that a party arguing patent ineligibility on a § 101 motion must so prove by clear and convincing evidence. As such, the Court rejects Plaintiffs' argument.

Denying Defendants' 12(b)(6) motion as premature in this case, merely because claim construction has not occurred, is unwarranted. At the hearing on Defendant's motion, counsel for Network Apparel presented proposed definitions that he considered "absolutely crucial for *Alice* purposes." Tr. at 8. Defendants accepted Network Apparel's proposed definitions for the purposes of this motion. *Id.* at 13. Accordingly, as mentioned above, the Court will use these proposed definitions in conducting its analysis. Network Apparel has not sufficiently demonstrated why further claim construction is necessary to determine whether the patent claims patent-eligible subject matter. *See Triplay v. WhatsAPP Inc.,* No. 13–1703–LPS, 2015 WL 1927696, at *6 (D.Del. Apr. 28, 2015) (Report and Recommendation adopted in part, rejected in part) (citing *Open Text S.A. v. Alfresco Software Ltd,* No. 13–cv–04843–JD, 2014 WL 4684429, at *3 (N.D.Cal. Sept. 19, 2014) ("the parties have not sought construction of any terms ... and this lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary to engage in claim construction before addressing validity under [§ ] 101")). Furthermore, as discussed herein, the asserted claims are drawn to an abstract idea and there is no reasonable construction of any term that would serve to bring the claims within the ambit of patentable subject matter. Accordingly, this Court's § 101 analysis is appropriate at the pleadings stage.

A final preliminary issue meriting discussion is what burden of proof is applicable to a § 101 challenge. There is no clear mandate from the Supreme Court or the Federal Circuit in this regard post-*Alice,* and lower courts are split as to whether

the clear and convincing evidentiary standard should still be applied in a challenge to a patent's eligibility under § 101.[2] Section 101 involves a legal analysis as to whether the basic character of the claimed subject matter is patent eligible and thus largely implicates questions of law. Therefore, to the extent legal questions bear on the ultimate question of subject matter eligibility, the court will decide those questions as a matter of law.[3] Although the issue of invalidity under § 101 presents a question of law, the court recognizes that a legal conclusion "may contain underlying factual issues." See Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1340–41 (Fed.Cir.2013); Ultramercial II, 722 F.3d at 1339 ("[T]he analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues."). To the extent questions of fact exist, the Court will apply the clear and convincing evidence standard.

2. Ultramercial II, 722 F.3d at 1339 ("the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility"); TriPlay, 2015 WL 1927696, at *5 ("even assuming that the 'clear and convincing' evidence standard is applicable to [§] 101 challenges, it would apply only to the resolution of factual disputes, not to the resolution of pure issues of law") (citing Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 131 S.Ct. 2238, 2242–43, 180 L.Ed.2d 131 (2011) (footnote omitted)); Trading Techs. Int'l, Inc. v. CQG, Inc., No. 05–CV–4811, 2015 WL 7.74655, at *3 (N.D.Ill. Feb. 24, 2015) ("until the Federal Circuit or the United [States] Supreme Court mandates otherwise, CQG must show by clear and convincing evidence that the patents-in-suit claim patent-ineligible subject matter."); Bascom Research, LLC v. LinkedIn, Inc., 77 F.Supp.3d 940, 945 (N.D.Cal. 2015) ("an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence"); Enfish, LLC, v. Microsoft Corp., 56 F.Supp.3d 1167, 1170 (C.D.Cal. 2014) ("Federal Circuit precedent requires courts to apply the [clear and convincing evidence] standard to § 101 challenges") (citing Ultramercial II, 722 F.3d at 1339); cf. Content Extraction, 776 F.3d at 1345–49 (in which the Federal Circuit affirmed a dismissal under § 101 at the Rule 12(b)(6) stage without discussion of any disputed issues of fact); Ultramercial III, 772 F.3d at 720–21 (Mayer, J., concurring) ("Although the Supreme Court has taken up several [§] 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility. The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the [§] 101 calculus.") (internal citation omitted); Shortridge v. Found. Constr. Payroll Servs., LLC, No. 14–cv–04850–JCS, 2015 WL 1739256, at *7 (N.D.Cal. Apr. 14, 2015) ("Although the clear and convincing evidence standard is not applicable to the Motion, Defendants, as the parties moving for relief, still bear the burden of establishing that the claims are patent[-]ineligible under § 101."); Wireless Media Innovations, LLC v. Maher Terminals, LLC, 100 F.Supp.3d 405, 411 (D.N.J.2015) ("With no authoritative law binding the Court as to an applicable standard, the Court adopts Judge Mayer's approach and will not afford Plaintiff's Patents the presumption of subject matter eligibility."); Modern Telecom Sys. LLC, v. Earthlink, Inc., No. SA CV 14–0347–DOC, 2015 WL 1239992, at *7 (C.D.Cal. Mar. 17, 2015) ("Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard-a burden of proof-to such motions.") (emphasis removed); Open TV, Inc. v. Apple, Inc., No. 14–cv–01622–HSG, 2015 WL 1535328, at *3 (N.D.Cal. Apr. 6, 2015) (rejecting the clear and convincing evidence standard and applying the Rule 12(b)(6) standard).

3. It is within this Court's province to make findings when deciding the legal question of whether the basic character of the claimed subject matter is patent ineligible. "Courts frequently make findings when deciding purely legal questions. Eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." Cal. Inst. of Tech. v. Hughes Commc'ns Inc., 59 F.Supp.3d 974, 978 n. 6 (C.D.Cal.2014) (citations omitted).

Network Apparel filed a Combined Motion for Partial Reconsideration asking the Court to reconsider denying its Opposed Motion to Convert Defendants' Motion to Dismiss into Motions for Summary Judgment. (ECF No. 36). At the hearing on Defendants' § 101 Motion, the undersigned orally denied Network Apparel's Motion after finding that no extrinsic evidence was necessary for claim construction as it related to the § 101 determination. Network Apparel requested reconsideration of the Court's ruling to allow for limited discovery into the issues of whether "network management device" and/or "controller" were a "generic or general purpose computer" in 2007 when the '079 Patent was filed and whether certain features found in the '079 Patent were an improvement over current technology in 2007. Pl.'s Combined Mot. for Clarification and Mot. for Partial Reconsideration, ECF No. 36 at 5. At a telephonic hearing on the Motion held November 19, 2015, the Court, for the reasons that follow, denied Plaintiffs' Motion.

The myriad case law addressing this issue, including a recent decision by the Federal Circuit, indicate that the focus of the § 101 analysis is a review of the intrinsic record—in particular the claims themselves—in order to determine invalidity. Tr. at 12; see, e.g., *Tranxition, Inc. v. Lenovo (United States) Inc.*, No. 3:12–cv–01065–HZ, 2015 WL 4203469, *17, 2015 U.S. Dist. LEXIS 89593, *39 (D.Or. July 9, 2015) ("[T]he analysis of patent eligibility under Section 101 must focus on the language of the claims themselves, not the additional detail set forth in the specification, or the inventor's testimony about the meaning of the patent claims") (citing *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed.Cir.2012) ("In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may preempt only that which the claims

encompass, not what is disclosed but left unclaimed."); *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.*, 540 F.3d 1337, 1346–47 (Fed.Cir.2008) (rejecting as irrelevant inventor testimony regarding the scope of the claim language). Furthermore, in this particular case, Network Apparel submitted a list of four specifically defined claim terms, which the Defendants accepted for the purposes of the § 101 analysis. Had there been a dispute with respect to those terms, perhaps discovery as to the meaning of those terms and how they should be defined might have been appropriate, but there was no such dispute.

At the hearing, Plaintiff argued that looking at the claims as an ordered combination in step two requires evaluating extrinsic evidence. However, the cases that have considered extrinsic evidence were decided on summary judgment because the claim terms in those cases had not been defined, and there was some ambiguity as to what those claim terms meant. Again, this case presents a different scenario because the terms are defined and the Court has the information necessary to reach a decision based upon the record before it.

Network apparel argues in its Supplemental Brief that multiple fact issues exist and urges the Court to convert the § 101 motion to a motion for summary judgment and allow for competent evidence to be presented. *See* Pl.'s Supp. Br. at 3. Converting this motion to summary judgment is not needed. As an initial matter, § 101 decisions are all questions of law to be decided by the Court, and it is well within the Court's province to make concomitant factual findings and general historical observations when making a § 101 determination. Additionally, the Court has considered the plain meaning of the claim terms, reviewed the intrinsic record in full, and has looked to secondary authority, in-

cluding district court cases evaluating patents with similar claim terms and those courts' decisions as to whether or not those terms were deemed generic. Thus, the record is complete and conversion to summary judgment is unnecessary.

## B. *Mayo/Alice* Step 1: Are the Claims of the '079 Patent Directed to an Abstract Idea?

■ The Court must first evaluate the patent claims "[o]n their face" and determine whether the claims are directed to patent-ineligible subject matter—"laws of nature, natural phenomena, and abstract ideas." *Alice*, 134 S.Ct. at 2355. The instant case only presents the question of whether the claims of the '079 Patent are directed to an abstract idea.

The Supreme Court and lower courts have provided some important principles to direct courts in evaluating whether an idea is abstract. At step one, "the court must identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract."[4] *Enfish*, 56 F.Supp.3d at 1173; *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed.Cir.2015) ("Under step one of *Mayo/Alice*, the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter"). "Application of the first step does not include a detailed examination of the asserted claims, either individually or as an or-

dered combination; that analysis is properly lodged within step two." *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12–10943–FDS, 2015 WL 1943826 (D.Mass. Apr. 28, 2015) (citing *Alice*, 134 S.Ct. at 2356 and *Mayo*, 132 S.Ct. at 1297. Instead, courts should recite a claim's purpose at a reasonably high level of generality. *Enfish*, 56 F.Supp.3d at 1174; *Cal. Inst. of Tech.*, 59 F.Supp.3d at 992. Step one is a "quick look" test, the purpose of which is to identify a risk of preemption and ineligibility. *Enfish*, 56 F.Supp.3d at 1173. If a claim's purpose is abstract, the court looks with more care at the specific claim elements in step two. *Id.* at 1174; *Cal. Inst. of Tech.*, 59 F.Supp.3d at 992. All of the claim limitations need not be abstract. The patent may not pass § 101 muster if "the concept embodied by the majority of the limitations" describes an abstract idea. *See Ultramercial III*, 772 F.3d at 715 (holding that "[a]lthough certain additional limitations, such as consulting an activity log, add a degree of particularity, *the concept embodied by the majority of the limitations describes only the abstract idea of showing an advertisement before delivering free content.*") (emphasis added).

■ The Court concludes that the purpose of the '079 patent—*i.e.*, what the '079 Patent is trying to achieve—is to incentivize an end user to acknowledge the receipt of a message. This conclusion finds support throughout the '079 Patent. For ex-

---

**4.** The Supreme Court took this approach in *Alice* (concluding that the steps embodied in the claims were meant to achieve the purpose of mitigating settlement risk); in *Bilski* (characterizing the claims in terms of the invention's purpose—hedging risk); and in *Mayo* (characterizing the claims in terms of the invention's purpose, which was applying a natural law). The Federal Circuit has followed suit: *Content Extraction*, 776 F.3d at 1347 ("data collection, recognition, and stor-

age"); *Ultramercial III*, 772 F.3d at 714 (holding that "the abstract idea at the heart of" the patent-in-suit was "that one can use [an] advertisement as an exchange for currency"); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed.Appx. 1005, 1008 (Fed.Cir.2014) ("managing a game of Bingo"); and *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. Appx. 988, 992 (Fed.Cir.2014) ("categorical data storage").

ample, the specification states that "it is an object[ive] of the present invention to provide a new and improved method of managing messaging on a network, by limiting access or rewarding end users for acknowledging messages." '079 Patent, col. 3 l. 51–54. The specification continues to detail various limitations and rewards for incentivizing message acknowledgement by an end user. '079 Patent, col. 5 l. 39–65. Further, the specification provides various examples of uses for incentivizing message acknowledgement. '079 Patent, col. 7 l. 11–44. Thus, the specification makes clear that the purpose of the '079 Patent is to incentivize an end user to acknowledge the receipt of a message. When asked at the hearing on Defendants' Motion, all parties agreed to this formulation of the purpose of the '079 Patent. Tr. at 46–47.

This finding is not changed by the fact that the claims of the '079 Patent recite limiting network access until a recipient acknowledges a message. See Enfish, 56 F.Supp.3d at 1173; Cal. Inst. of Tech., 59 F.Supp.3d at 992. For example, in Alice, the Court concluded that the claims at issue were directed to mitigating settlement risk. Alice, 134 S.Ct. at 2352. The Court reached this conclusion despite the fact that the claims outlined steps for an entire process of achieving this purpose.

Id. These claimed steps were not the purpose of the patent, but rather were meant to achieve the purpose of mitigating settlement risk. Similarly, the claims of the '079 Patent recite steps for limiting network access until a recipient acknowledges a message. However, limiting network access is not what the '079 Patent is trying to achieve. Like in Alice, the claimed steps are meant to achieve the purpose of the patent. Limiting access of end users is merely the manner by which the claims achieve their purpose. Accordingly, the purpose of the claims of the '079 Patent, recited at "a reasonably high level of generality," is to incentivize an end user to acknowledge the receipt of a message.

The Court next examines whether this purpose is abstract. See Enfish, 56 F.Supp.3d at 1174. The Supreme Court has made clear that patents claiming fundamental economic and business practices[5] are directed to abstract ideas. However, the Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in Alice—instead, it left the lower courts to develop the category on a case-by-case basis. 134 S.Ct. at 2357. Decisions from the Federal Circuit offer guidance. Since Alice, the Federal Circuit has issued thirteen decisions interpreting § 101.[6] In addition, post-Alice district

---

5. See Bilski, 561 U.S. at 609, 130 S.Ct. 3218 (finding that claims describing the "fundamental economic practice" of hedging to be patent-ineligible abstract idea); Alice, 134 S.Ct. at 2356 (finding that intermediated settlement, like hedging, was an abstract idea).

6. The Federal Circuit invalidated: a claim describing the process of taking two data sets and combining them into a single data set known as a "device profile" because it recited the "abstract process of gathering and combining data that does not require input from a physical device" (Digitech Image Techs., LLC v. Elecs. for Imaging, Inc., 758 F.3d 1344 (Fed.Cir.2014)); a patent that managed "a bingo game while allowing a player to re-

peatedly play the sets of numbers in multiple sessions" because the idea "consists solely of mental steps which can be carried out by a human using pen and paper" (Planet Bingo, 576 Fed.Appx. at 1007); a patent directed to another business method that was "a well-known, and widely understood concept—a third party guarantee of a sales transaction—and then applied that concept using conventional computer technology and the Internet" (buySAFE, 765 F.3d at 1352); a patent that claimed the business method of using "an advertisement as an exchange for currency" (Ultramercial III; 772 F.3d at 714); patent claims directed to identifying alterations of a gene by comparing the patient's gene with a "wild-type" gene and identifying inconsisten-

court opinions, including decisions from within this District,[7] have found the ideas embodied in claims to be abstract in a wide variety of systems and processes. These decisions from the Supreme Court, Federal Circuit, and the district courts make clear that fundamental economic or longstanding commercial practices are abstract.[8] At issue in the instant case is whether incentivizing an end user to acknowledge the receipt of a message is a longstanding commercial practice.

■ In determining whether the purpose of a patent is abstract, it is within the Court's province to consider both the patent specification and well-known, general historical observations. *Affinity II*, 109 F.Supp.3d at 793, 2015 WL 3764356 at *9.

cies arising therefrom (*In re BRCA1– and BRCA2–Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755 (Fed.Cir.2014)); a patent directed to a well-known practice in the banking industry of storing and collecting data, a function that "humans have always performed," especially in the banking industry (*Content Extraction*, 776 F.3d at 1347); a claim describing "the fundamental economic concept of offer-based price optimization through the use of generic computer functions" (*OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed.Cir.2015)); a patent directed to non-invasive prenatal testing using cffDNA circulating in the blood of pregnant women (*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed.Cir.2015)); a patent directed to dynamic tabs for preventing data loss in an online application consisting of dynamically generated web pages (*Internet Patents Corp. v. Active Network Inc.*, 790 F.3d 1343, 1348 (Fed.Cir.2015)); patents related to budgeting and customizing web page content as a function of navigation history and information known about the user (*Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1365 (Fed.Cir.2015)); a patent directed to determining prices using organizational and product group hierarchies (*Versata Development Group, Inc. v. SAP America, Inc.*, 793 F.3d 1306, 1333 (Fed.Cir. 2015)); and a patent claiming "the abstract idea of testing operators of any kind of moving equipment for any kind of physical or mental impairment" (*Vehicle Intelligence and Safety, LLC, v. Mercedes–Benz USA, LLC*, No.2015–1411,635 Fed.Appx. 914, 2015 WL 9461707 (Fed.Cir. Dec. 28, 2015)). However, in *DDR Holdings v. Hotels.com, L.P.*, the Federal Circuit found that patents directed to systems and methods of generating a composite web page that combines certain visual elements of a "host" website with content of a third-party merchant were patent-eligible. 773 F.3d 1245, 1259 (Fed.Cir.2014).

7. See *Morales v. Square, Inc.*, 75 F.Supp.3d 716, 724 (W.D.Tex.2014) (cataloging cases); *see id.* at 724 ("The Federal Circuit's decision in *Digitech Image Techs., LLC v. Elec. for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014), however, indicates that the abstract ideas category is broad."); *Affinity I*, 2015 WL 3757497, at * 8 (finding that delivering selectable media content and subsequently playing the selected content on a portable device is abstract); *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 109 F.Supp.3d 916, 938, 2015 WL 3764356, *20 (W.D.Tex.2015) (*Affinity II*) (finding that the dissemination of regionally broadcast content to users outside the region is an abstract idea).

8. See, e.g, *Alice*, 134 S.Ct. at 2356 ("hedging is a longstanding commercial practice"); *Bilski*, 130 S.Ct. at 3231 (finding the "fundamental economic practice" of hedging to be patent ineligible); *DDR Holdings*, 773 F.3d at 1257 (during step one of the Alice test the Federal Circuit found the claims did not "recite a fundamental economic or longstanding commercial practice"); *In re TLI Commc'ns LLC Patent Litig.*, 87 F.Supp.3d 773, 783 (E.D.Va. 2015) ("An abstract idea need not be a "preexisting, fundamental truth" and can instead merely be a "longstanding commercial practice") (quoting *Alice*, 134 S.Ct. at 2356); *Morales*, 75 F.Supp.3d at 724 ("a claim is directed to an abstract idea when it describes a fundamental concept or longstanding practice). *Affinity I*, 2015 WL 3757497, at *8 ("delivering selectable media content and subsequently playing the selected content on a portable device is a longstanding commercial practice"); and *Affinity II*, 109 F.Supp.3d at 938, 2015 WL 3764356, at *20 ("the dissemination of regionally broadcast content to users outside the region ... is a well-known, longstanding, commercial business practice").

A § 101 determination is a question of law, and "[c]ourts frequently make findings when deciding purely legal questions." *Cal. Inst. of Tech.*, 59 F.Supp.3d at 978, n. 6. Further, patent "[e]legibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions[,]" and "[t]he Federal Circuit has noted that § 101 analysis is 'rife with underlying factual issues.'" *Id.* (quoting *Ultramercial II,* 722 F.3d at 1339). Several Federal Circuit decisions have taken this approach of relying on general historical observations in ruling on a 12(b)(6) motion. *See, e.g., buySAFE,* 765 F.3d at 1354–55; *Ultramercial III,* 772 F.3d at 722–23 (Mayer, J., concurring); *Content Extraction,* 776 F.3d at 1347.

The commercial practice of incentivizing an end user to acknowledge the receipt of a message is both well-known and historically longstanding. Many examples are encountered within the course of everyday life. One such example is the practice of sending mail as U.S. Certified Mail Return Receipt Requested. Using this service, a party sending a letter can incentivize a receiving party to acknowledge the receipt of that letter by withholding delivery until the receiving party signs a return receipt. This practice is also found in common advertising initiatives. For example, a seller can attempt to gain more information about a buyer by providing discounts responsive to the buyer completing a survey, thus incentivizing the buyer to acknowledge the receipt of the survey.

Both in its briefing and at the hearing, Defendants analogize the '079 Patent to telephone companies' longstanding practice of limiting a customer's access to the telephone network until the customer pays their past due account, thus incentivizing the customer to acknowledge the receipt of their bill. Network Apparel responds by distinguishing the '079 Patent from "the simple yes/no, on/off access of the Defendants' telephone company." Pl.'s Resp. at 14. Instead, Network Apparel argues that the '079 Patent is distinguishable because the claimed system "increases or decreases (but does not terminate) a particular device's access to a particular network." *Id.* Even if Network Apparel is correct, such a distinction is irrelevant. The purpose of this stage of the analysis is to determine whether the purpose of the patent is abstract, not to conduct "a detailed examination of the asserted claims." *Kenexa BrassRing, Inc.,* 2015 WL 1943826, at *4. Despite these differences, this example is the type of historical observation demonstrative of the '079 Patent's purpose as a longstanding commercial practice.

This practice of incentivizing an end user to acknowledge receipt of a message is also found in the context of the Internet. For example, the host of a website can incentivize a visitor to accept a "Terms of Use" agreement, thus acknowledging the receipt of that message, by restricting access to the website until the visitor accepts the agreement. When asked at the hearing, Network Apparel agreed that this example fell within the scope of the '079 Patent. Tr. at 52–53. The examples enumerated by no means constitute an exhaustive list. Rather, they are simply some of the more prevalent instances of the practice routinely encountered in everyday life. Accordingly, the Court finds that the purpose of '079 Patent is a well-known, longstanding commercial practice.

Having found that the purpose of the '079 Patent is to incentivize an end user to acknowledge the receipt of a message and that such purpose is a well-known, longstanding, commercial business practice, the Court finds as a matter of law that the claims of the '079 Patent are directed to an abstract idea.

Furthermore, in a joint Supplemental Brief filed with the Court, Network Apparel conceded that "the stated purpose and the abstract idea to which the '079 patent relate are one and the same. To the extent that claims being 'directed to' an abstract idea means merely that such abstract idea is somehow embedded within the claimed subject matter, then [Network Apparel] will likewise concede that the '079 claims are 'directed to' the stated abstract idea of 'to incentivize an end user to acknowledge receipt of a message.'" Pl.'s Supp. Br. at 5.

Because the Court finds that the Plaintiff's claims are drawn to an abstract idea and because Plaintiff conceded the same, the Court will now move to the second step of the analysis: determining whether the claim includes an inventive concept "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S.Ct. at 2355 (internal brackets omitted).

## C. *Mayo/Alice* Step 2: Do the Claims of the '079 Patent Contain an "Inventive Concept"?

The Court finds that claim 1 is representative of the other claims in the '079 Patent. However, in an abundance of caution, the Court will analyze each of the independent claims—claims 1, 9, and 15—in its search for an "inventive concept." The Court will begin with system claim 1 before proceeding to method claims 9 and 15.

The United States Supreme Court has held that if an abstract idea is found at Step One, then at Step Two of the analysis the Court is to:

> examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application. A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].' *Mayo* made clear that transformation into a patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'"

*Id.* at 2357 (citations omitted). The Court is to consider claim elements both individually and as an ordered combination. *Id.* at 2355. Further, the "additional features" must be more than "well-understood, routine, conventional activity." *Ultramercial III*, 772 F.3d at 715 (citing *Mayo*, 132 S.Ct. at 1298) (internal quotations omitted). *Alice* also held that the "[m]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S.Ct. at 2358. The Supreme Court held that stating an abstract idea "while adding the words 'apply it with a computer'" amounts to a "mere instruction to 'implemen[t]' an abstract idea 'on ... a computer'" and "cannot impart patent eligibility." *Id.* (quoting *Mayo*, 132 S.Ct. at 1301). In this regard, any findings made below by the Court as to whether the system or method claims contain "well-understood, routine, conventional activity," or refer to "generic" computer(s) or their components all relate to what was conventional, routine or generic at the time of the invention.

Two post-*Alice* Federal Circuit cases are particularly instructive for Step Two—*Ultramercial III* and *DDR Holdings*. In *Ultramercial III*, the patent at issue claimed a method for displaying an advertisement in exchange for access to copyrighted material. 772 F.3d at 714. As an inventive concept, the patentee pointed to a detailed, eleven-step process disclosed in the patent for implementing this abstract idea. *Id.* at 714–15. While the Federal

Circuit agreed that some of the steps added a "degree of particularity," it ultimately found that "the concept embodied by the majority of the limitations describes only the abstract idea of showing an advertisement before delivering free content." *Id.* at 715. Even though "some of the eleven steps were not previously employed in this art," the court held that this was "not enough—standing alone—to confer patent eligibility." *Id.* at 716. In his concurrence to the *Ultramercial III* decision, Judge Mayer offered the following guidance: "[An idea] can escape the realm of the abstract only through concrete application ... This concrete application is new technology—taking [an ineligible concept] and 'tying it down' *by implementing it in a precisely defined manner.*" *Ultramercial III*, 772 F.3d at 722 (Mayer, J., concurring) (citing *Mackay Radio & Tel. Co. v. Radio Corp.*, 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939)) (emphasis added).

In contrast to *Ultramercial III* stands the Federal Circuit's decision in *DDR Holdings*. The patents at issue in *DDR Holdings* solved a problem unique to the Internet, and more specifically unique to Internet commerce. At the time, existing systems allowed third party merchants to "lure [a host website's] visitor traffic away" from the host website because visitors would be taken to the third-party merchant's website when they clicked on the merchant's advertisement. U.S. Patent. No. 6,629,135, col. 2, ll. 26–30. The claimed solution used a series of steps to create a hybrid website, incorporating "look and feel" elements from the host website with commerce objects from the third-party merchant's website. *DDR Holdings*, 773 F.3d at 1257–58. In finding that the claimed solution amounted to an inventive concept, the Federal Circuit emphasized that "the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two

web pages look the same," but rather recite "*a specific way* to automate the creation of a composite web page." *Id.* at 1259 (emphasis added).

■ These two cases demonstrate that, to "transform" the claims into a patent-eligible application, the claims must recite a specific, concrete application of that abstract idea that amounts to "more than a drafting effort designed to monopolize the abstract idea." *Alice*, 134 S.Ct. at 2357. The abstract idea must be implemented "in a precisely defined manner" that provides "a specific way" to achieve the purpose of the patent. "[T]he key question is whether the claims add something to the abstract idea so that the patent covers a *specific application* of the abstract idea, rather than the idea itself." *Netflix, Inc. v. Rovi Corp.*, 114 F.Supp.3d 927, 937, 2015 WL 4345069, at *7 (N.D.Cal. July 15, 2015) (emphasis added).

In its supplemental briefing on this issue, Network compared a hypothetical claim "commensurate with the scope of" the '079 Patent's abstract idea with the '079's actual claims to highlight that the '079 Patent is significantly more than a patent directed to an abstract idea. Pl.'s Supp. Br., ECF No. 43 at 6–7. In light of the fact that there are no cases that support Plaintiff's proposed manner of analysis, the court finds Plaintiff's hypothetical unpersuasive. A hypothetical is just that—a hypothetical—and it is not the Court's role to make new law based on hypothetical claims but instead to follow existing law.

*Analysis of Claim 1*

■ In its brief, Network Apparel contends that the '079 Patent provides "a targeted solution tied to specific system components, arrangements and functionalities to solve a specific problem," thereby "transform[ing] the nature of the claims"

into a patent-eligible application. Pl.'s Resp. at 15. In support of this contention, Network Apparel points to three different features of the '079 Patent—a "network management device," a "controller," and the "access rules." *Id.* at 16. As noted above, Network Apparel provided proposed definitions to four terms that it identified as "absolutely critical for *Alice* purposes." Tr. at 9. At the hearing, counsel for Network Apparel stated that these definitions were necessary to determine whether the devices recited in the claims constitute a generic computer. Tr. at 17. These proposed definitions will be used for the purposes of this analysis.

The Court first considers the "network management device" recited in claim 1. In the specification of the '079 Patent, "network management device" is described as "an in-line device located between an end user and a wide area network ... The network management device allows users in the limited area network to connect to the wide area network." '079 Patent, col. 2, ll. 35–39. Network Apparel presented a considerably more ambitious definition at the hearing, in which it defined "network management device" as:

> "A high-speed multi-port server class network appliance (hardware and software) that manipulates, manages, and

regulates connections between data networks and network devices. The device is configurable, responsive to programmed triggering events or circumstances, to (1) establish and monitor network access for network devices, (2) establish default bandwidth allocation to connected network devices, and (3) modify bandwidth allocation to connected network devices."

Counsel for Network Apparel asserted that this "network management device" escapes *Alice'* s proscription of the "mer[e] recitation of a generic computer [to] transform a patent-ineligible abstract idea into a patent-eligible invention," which he took "to mean something you would go buy at Best Buy or ... a MacBook Pro or a PC." Tr. at 18. The Court disagrees with both propositions.

What is considered a "generic computer" is not restricted to only what one could readily purchase from a Best Buy. Indeed, courts have found devices and functions to be generic computer features in a wide variety of different systems.[9] As *Alice* instructs, the hardware recited in a system claim, in order to supply an inventive concept, must "offer[ .,.] a meaningful limitation beyond generally linking 'the use of the [method] to a par-

---

9. See *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir.2015) (finding a "database," a "user profile," and a "communication medium" to be generic computer elements); *Alice*, 134 S.Ct. at 2360 (finding a "data processing system," a "communications controller," and a "data storage unit" to be generic); *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2015 WL 4203469, at *11 (D.Or. July 9, 2015) (finding "providing configuration information about configuration settings" to be simply conventional data gathering); *Joao Bock Transaction Sys., LLC v. Fid. Nat. Info. Servs., Inc.*, 122 F.Supp.3d 1322, 1334–35, 2015 WL 4743669, at *9 (M.D.Fla. Aug. 10, 2015) (finding that various computer components recited in the claims

failed to add an inventive concept, including "memory device," "communication device," "receiver," "transmitter," "processing device," "input device," "display device," and "data entry device"); *Telinit Technologies, LLC v. Alteva, Inc.*, 2015 WL 5578604, at *17 (E.D.Tex. Sept. 21, 2015) (finding that the recitation of a generic "processor" and "network" did not remove the claims from the realm of an abstract idea); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 134 F.Supp.3d 877, 925, 2015 WL 5686643, at *38 (W.D.Pa. Sept. 25, 2015) (finding limitations such as a "local device," a "network server," and "pointers" are conventional and well-known computer technology).

ticular technological environment,' that is, implementation via computers." *Alice,* 134 S.Ct. at 2360 (quoting *CLS Bank Intern v. Alice Corp.,* 717 F.3d 1269, 1286 (Fed.Cir.2013) (Lourie, J., concurring)). The claimed "network management device," even with the benefit of Network Apparel's proposed definition, does not provide this meaningful limitation. Network Apparel's definition of "network management device" consists of two sections. The first section provides that the device is "[a] high-speed multi-port server class appliance (hardware and software) that manipulates, manages, and regulates connections between data networks and network devices." These are merely the generic functions of a generic server and cannot impart patent eligibility. The second section inserts steps of the claimed method into the definition itself: "This device is configurable, responsive to programmed triggering events or circumstances, to (1) establish and monitor network access for network devices, (2) establish default bandwidth allocation to connected network devices, and (3) modify bandwidth allocation to connected network devices." This too, however, merely recites routine, well-known server functions that can be performed by a generic server.[10] For example, Internet Service Providers ("ISPs") routinely perform the tasks of providing network access and regulating bandwidth allocation to connected network devices. Accordingly, the "network management device" is merely a generic networking device that does not, in itself, transform the nature of the claim into a patent-eligible application.

Next, Network Apparel points to the "controller" as a "specific system component" that supplies an inventive concept. The specification of the '079 Patent provides some description of the claimed controller. It states that "[t]he network management device [ ] comprises a controller, *such as a computer,* to manage data." '079 Patent, col 4, ll. 30–31 (emphasis added). Further, the specification makes clear that the controller can be either a discrete object or integrated with the network management device into a single unit. *Id.* at col. 7, ll, 56–61. Network Apparel's proposed definition of "controller" provides as follows:

> A computing device operably connected with a network management device, configured for identifying network devices by device-identifying attributes, communicating parameters to a connected network management device for: (1) establishing and monitoring network access for network devices; (2) establishing default bandwidth allocation to connected network devices; and (3) modifying bandwidth allocation to connected network devices.

However, this definition faces the same problems as the definition of "network management device." Network Apparel's definition of "controller" also consists of two sections. The first section merely provides that the two devices are "operably connected" and that the controller is configured to identify network devices. This is a generic computer function commonplace in computer networking. The second section incorporates the steps of the claimed method into the definition, stating that the controller "communicat[es] parameters to a connected network man-

10. *See In re TLI Commc'ns LLC Patent Litig.,* 87 F.Supp.3d at 788 (finding that an "intelligent" server performing the functions of (1) receiving data, including digital images and classification information, (2) extracting from the received data the classification information, and (3) storing the digital images by taking the classification information into consideration did not include an inventive concept).

agement device for: (1) establishing and monitoring network access for network devices; (2) establishing default bandwidth allocation to connected network devices; and (3) modifying bandwidth allocation to connected network devices." The three listed steps are the same three well-known, routine functions provided in the definition of "network management device." The only thing added to this definition is that the controller "communicat[es] parameters to a connected network management device." Communication between network devices is unquestionably well-known and routine. Accordingly, the "controller" is merely a generic computer that does not supply an inventive concept.

The Court pauses to further comment on the proposed definitions provided by Network Apparel. In finding that the claimed "network management device" and "controller" are generic computing devices that do not supply an inventive concept, the Court considers these proposed definitions to be "no more than elaborate descriptions of rudimentary computer functions." *Neochloris, Inc. v. Emerson Process Mgmt. LLLP*, 140 F.Supp.3d 763, 773, 2015 WL 5951753, at *7 (N.D.Ill. Oct. 13, 2015). The recited "network management device" and "controller" are no more than generic networking devices and do no more than provide a technological environment in which to apply the abstract idea underlying the '079 Patent. Network Apparel's attempt to characterize these generic devices in such expansive terms is like putting lipstick on a pig. However, no amount of cosmetic touchup will allow these generic computing devices to pass for an inventive concept sufficient to confer patent eligibility on claims directed to an abstract idea. Insofar as Network Apparel relies on the "network management device" and "controller" components to move claims directed to a patent-ineligible

concept into the realm of patent eligibility, such reliance is misplaced.

Network Apparel next relies on the claimed "access rules" to supply an inventive concept, stating that "the controller us[es] multiple access rules to increase or decrease a particular device's level of access to a network." Pl.'s Resp. at 16. Network Apparel did not identify "access rule" as one of the terms that required a proposed definition for the purposes of this motion. In its brief, Network Apparel states the importance of the "access rules" as follows:

[The] regulation or management of the access is a critical limitation because the concept is not found in defendant's telephone network example, nor anywhere in the prior art. This problem of regulating—but not entirely eliminating—access to a network was what the inventors of the '079 Patent have solved with their invention.

*Id.* Thus, Network Apparel asserts that the "access rules" supply an inventive concept because they are novel. The Court doubts this premise. For example, the Southern District of New York recently found a patent claiming similar "access rules" to be directed to an abstract idea and to lack an inventive concept. *See Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, 2015 WL 1941331 (S.D.N.Y April 28, 2015). The patent at issue, U.S. Patent No. 6,826,694 ("the '694 Patent"), entitled "High Resolution Access Control," was issued on November 30, 2004. *Id.* at *1. The '694 Patent claimed a method of using "access rules" for filtering packetized information received by a network's firewall. *Id.* In that case, "access rule" was defined as "[a] rule for filtering information traveling between a source and a destination." *Id.* This demonstrates the use of "access rules" for controlling levels of access in the context of computer networking as early

as 2004, three years before the '079 Patent issued.

Further, the "access rules" of the '079 Patent closely resemble the patent at issue in *Ultramercial III*. In that case, the patent at issue claimed "a method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement." *Ultramercial III*, 772 F.3d at 712. There, the patent claimed sending a message to an end user, receiving the end user's response to that message, and increasing the end user's access to content on a network based on that response. *Id.* This functionality, found to lack an inventive concept in *Ultramercial III*, is strikingly similar to the "access rules" of the '079 Patent. These examples support a finding that the "access rules" of the '079 Patent are conventional and routine in the context of computer networking and fail to supply the necessary inventive concept.

Both at the hearing and in its written closing remark, Network Apparel repeatedly emphasized that the claimed "access rules" solved a problem and, accordingly, could not be considered conventional: "[The access rules] addressed unsolved problems. They by definition, in my way of thinking, can't be conventional. If a problem was left to be solved, that which creates this modification instead of termination alone can't be conventional." Tr. at 83. Network Apparel argues that because "the '079 Patent covers a system and method that solved a problem that existed (i.e. was not solved) at the time of invention ... [then] the '079 Patent necessarily is directed to something that was not well understood, routine, or conventional in the industry at that time." Pl.'s Supp. Br. at 8. This argument misses the point. Just because a problem is unsolved does not

mean that every solution to that problem will necessarily satisfy Step Two of the *Mayo/Alice* Test.

The Federal Circuit made this abundantly clear in *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371 (Fed.Cir. 2015). The patent at issue in *Ariosa*, U.S. Patent No. 6,258,540 ("the '540 Patent"), also addressed an unsolved problem. The '540 Patent related "to prenatal detection methods using non-invasive techniques." '540 Patent, col. 1, ll. 6–7. Prior art techniques for performing such testing required taking samples from the fetus or placenta, which posed risks to both the mother and the pregnancy. *Id.* at col. 1, ll. 12–17. Thus the conventional techniques left an unsolved problem—performing prenatal testing in a manner that does not pose a risk to the mother or the pregnancy. The '540 Patent addressed that unsolved problem. The '540 Patent claimed a non-invasive method for performing this prenatal testing, allowing doctors to perform the diagnosis by examining a maternal blood sample rather than taking a fetal sample. Despite this, the Federal Circuit still held that the claims of the '540 Patent failed to supply an inventive concept sufficient to satisfy Step Two of the *Mayo/Alice* Test. *Ariosa*, 788 F.3d at 1376.

Further, Network Apparel's reliance on 35 U.S.C. § 102 novelty considerations to supply an inventive concept is misplaced. Even if, for the purposes of this motion, the "access rules" do not constitute well-known, routine, conventional activity, the claimed "access rules" still do not amount to an inventive concept because they lack the specific, concrete application required to satisfy Step Two.

The '079 Patent provides little discussion of the claimed "access rules," which are not even mentioned in the "Description of the Preferred Embodiment" section of specification. The claim language offers

little more by way of specificity. Claim 1 states that the controller creates a first and a second "access rule" for a particular network device, that levels of access to the wide area network are provided pursuant to those "access rules," and that the second "access rule" limits access more than the first. The claim does not, however, recite how the "access rules" are created or how the varying levels of access are provided pursuant to those "access rules." The claim states that the second "access rule" is "more restrictive" than the first, but it does not recite how it is more restrictive. In short, the claimed "access rules" simply fail to provide the specific, concrete application required to transform the nature of the claim into a patent-eligible application. Accordingly, the claimed "access rules" do not provide an inventive concept.

 Next, Network Apparel argues that "the claimed method is tied to a particular set of machines, thereby satisfying the machine or transformation test." The "machine or transformation" test can be a "useful clue" in Step Two of the *Mayo/Alice* analysis. Under the "machine or transformation" test, a claimed process can be patent eligible if: 1) it is tied to a particular machine or apparatus; or 2) it transforms a particular article into a different state or thing. *See Bilski*, 561 U.S. at 603, 130 S.Ct. 3218. Network Apparel only discusses the first prong of the "machine or transformation" test with respect to the '079 Patent. Pl.'s Resp. at 16. Accordingly, the Court will only apply the first prong.

Network Apparel first argues that the network management device is "connected to both a wide area and a limited area network." *Id.* Further, Network Apparel contends that "there are individual network devices, which are uniquely identified by a controller." *Id.* "The methods of the '079 Patent cannot be practiced, and the systems cannot be created, without these necessary pieces of hardware." *Id.*

In reviewing claim 1, the Court finds that it fails the "machine or transformation" test. The "network management device" and "controller" that Network Apparel points to are, as noted above, nothing more than generic networking devices. The additional "machines" that Network Apparel identifies—such as "a wide area network," "a limited area network," and "individual network devices"—are also generic. Further, the fact that the claimed method and system require hardware does not transform the generic network devices and components into a specific machine. Accordingly, the recited devices fail to tie the process to a particular machine sufficient to satisfy the "machine or transformation" test or impart patent eligibility.

In *Alice*, the Supreme Court set out a "technological arts" [11] test, finding that the asserted method and system claims: (1) did not "purport to improve the functioning of the computer itself," (2) "nor [did] they effect an improvement in any other technology or technical field." *Alice*, 134 S.Ct. at 2359. In order to satisfy the "technological arts" test, claims must "not only 1) describe a technological objective, but 2) set out a precise set of instructions for achieving it." *Ultramercial III*, 772 F.3d at 721–22 (Mayer, J., concurring). In determining whether a claim presents an inventive concept, the Federal Circuit and *post-Alice* district courts have examined whether the inventive concept has a "specific functionality" or explains the "how" as to the manner in which the inventive concept performs. *See id.*; *see also Vehicle Intelligence and Safety, LLC*, 635 Fed. Appx. at 919, 2015 WL 9461707, at *4 (

---

11. *See Ultramercial III*, 772 F.3d at 721 (Mayer, J., concurring).

[M]arkedly absent from the [ ] Patent is any explanation of *how* the methods at issue can be embedded into these existing models) (emphasis supplied); *TriPlay,* 2015 WL 1927696, at \*15; *TLI Commc'ns,* 87 F.Supp.3d at 797–98. In *TLI Communications,* the Eastern District of Virginia, in examining whether the claimed limitation was an inventive concept, found the Federal Circuit's decision in *Dealertrack, Inc. v. Huber,* 674 F.3d 1315 (Fed.Cir. 2012) instructive, wherein the circuit court noted:

> Although the district court construed 'computer aided' as a limitation, the '427 patent does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent ... The claims are silent as to *how* a computer aids the method, the *extent* to which a computer aids the method, or the *significance* of a computer to the performance of the method. The undefined phrase 'computer aided' is no less abstract than the idea of a clearinghouse itself.

*Id.* at 796 (citing *Dealertrack,* 674 F.3d at 1333).

At the hearing, counsel for Network Apparel stated that the '079 Patent was "altering the way the Internet or these data management systems are functioning. [The '079 Patent is] changing the technology itself, not merely implementing something within the technology that's already been done but maybe in a slightly different way." Tr. at 83. However, even if this is the case, the claims fail to provide the "specific functionality" or explain the "how" as to the manner in which the '079 Patent has changed the technology itself. The claim does not "set out a precise set of instructions for achieving" its technological goal. Accordingly, the claims of the '079 Patent do not reach the realm of patentability through the "technological arts" test.

The remaining limitations of claim 1, considered "both individually and as an ordered combination," fail to transform the nature of the claim into a patent-eligible application of the abstract idea. Claim 1 contains seven limitations beyond the generic network devices discussed above. These limitations recite: (1) the controller authenticating a particular network device by a unique attribute, (2) creating a first "access rule" for the network device, (3) providing the network device with access to the wide area network according to the first "access rule," (4) creating a second "access rule" for the network device responsive to sending a message to the network device, (5) where the second "access rule" limits access more than the first "access rule," (6) providing the network device access to the wide area network according to the second "access rule" until a user acknowledges the message, and (7) providing the network device access according to the first "access rule" responsive to the acknowledgement.

The majority of these limitations, (2)–(7) above, describe the abstract idea of incentivizing an end user to acknowledge the receipt of a message. Claim 1 creates this incentive by restricting a user's level of access, "and most notably that would typically be bandwidth," until the user acknowledges a message. Tr. at 9. However, the claimed limitations simply implement the abstract idea using, in the context of computer networking, "well-understood, routine, conventional activit[ies]" performed on generic devices and components.[12]

---

12. *Mayo* is instructive in determining whether activity is "routine" or "conventional." The patents at issue in *Mayo* claimed a method for measuring metabolites in the bloodstream to determine the appropriate dosage of thiopurine drugs to administer in the treat-

For example, the specification states that the "wide area network" in the claims could include "the worldwide network known as the Internet, a television channel aggregator such as a cable television operations unit, a telephone network or another data network." '079 Patent col. 4 ll. 42–46. The "uniquely-identifiable device" is described as including "computers, video game devices, media servers, cable boxes or telephones" as well as "public devices intended for multiple users, such as a digital concierge, access control touch pad, or any other networkable device ... [that] has a unique attribute, such as a MAC (Media Access Control) address, a SIM (end user identity module), or other access control attribute." *Id.* at col. 4 ll. 49–57. The specification also describes the "limited area network" in broad terms, stating that it:

> may consist of a single office, building, residential complex, college campus, neighborhood or city, or may be a non-geographic area, such as the users of an Internet Service Provider, a cable network or a telephone system. It is noted that the limited area may have a common demographic, such as college students; or residents of, or workers in, a particular geographic area or common living area or office building, referred to by those skilled in the art as a multiple dwelling unit (MDU), or a multiple tenant unit (MTU). The network may be a computer network, a cable television network, or a phone network.

*Id.* at col. 4, ll. 31–42. These devices are certainly generic and do not amount to an inventive concept.

The other activities and devices recited by claim 1 are no less routine or conventional. The limitation of claim 1 that provides the incentive is the "second access" rule that "limits" the level of access. Network Apparel defines "limit" as "modifying a level of access from a limited area network to a wide area network without wholly terminating such access." Tr. at 15. While this definition seems to contemplate that the level of access for the second "access rule" could be greater than that of the first "access rule," such a reading would be in direct conflict with the express language of claim 1, which states that "said second access rule limits access ... *more* than said first access rule." '079 Patent, col. 8, ll. 31–34 (emphasis added). However, even accepting Network Apparel's definition for the purposes of this motion, this limitation fails to provide the inventive concept required. Modifying a level of access to a wide area network, by either increasing or decreasing without wholly terminating such access, is a well-known, routine activity in the field. For example, ISPs routinely modify a customer's level of access to a wide area network, especially bandwidth, based on the customer's chosen access plan. Thus, this limitation, even with Network Apparel's proposed definition, fails to supply an inventive concept.

When one looks beyond the limitations implementing the abstract idea, one is left

ment of autoimmune diseases. *Mayo,* 132 S.Ct. at 1294–96. In analyzing the steps of the claimed method, the Court noted that "methods for determining metabolite levels were well known *in the art.*" *Id.* at 1297–98 (emphasis added). Thus, the claimed "determining" step did nothing beyond instruct the relevant audience "to engage in well-understood, routine, conventional activity previously engaged in by [professionals] who work *in*

*the field.*" *Id.* at 1298 (emphasis added). Accordingly, the relevant inquiry is not whether an activity is "routine" or "conventional" in the abstract—indeed, many activities would be considered unconventional by those wholly isolated from the relevant art. Rather, the proper inquiry is whether the activity is considered "routine" or "conventional" "in the field."

with only, "wherein said controller authenticates a particular network device identified by its unique attribute." This preliminary step is a well-understood, routine, conventional activity in the computer networking field that does not make the claim patent-eligible. Indeed, the specification of the '079 Patent provides no discussion whatsoever of how the claimed method or system performs this "authenticating" step. This indicates to the Court that the activity was so well-understood or routine that it did not merit explanation to fully enable the '079 Patent.

When considering the claims as an ordered combination, the court finds that the invention as a whole does not amount to an inventive concept sufficient to transform the nature of the claimed invention into patent-eligible subject matter. In *Ultramercial III*, the court determined that the claims as an ordered combination failed to transform the nature of the claim into patent-eligible subject matter because the claimed combination comprised only conventional steps specified at a high level of generality. *Ultramercial III*, 772 F.3d at 715. In his concurrence to the *Ultramercial III* decision, Judge Mayer suggested that to transform an ineligible concept into patent-eligible subject matter, the claims must implement the idea in a precisely defined manner. *See Ultramercial III*, 772 F.3d at 722 (Mayer, J., concurring).

Viewed as a whole, the claimed invention comprises a generic computer system that uses a series of steps, specified at a high level of generality, to incentivize an end user to acknowledge the receipt of a message by restricting access to a wide area network using a second access rule. The claimed invention is not precisely defined and it is not limited to a certain type of network, but instead seeks to claim all applications of incentivizing an end user to acknowledge the receipt of a message by

restricting access to a wide area network, which the Court finds to be nothing more than "a drafting effort designed to monopolize the [abstract idea]." *Alice*, 134 S.Ct. at 2357. The majority of the limitations implement the abstract idea using well-known, conventional activity. The remaining limitations recite generic devices and components performing routine functions. Viewed as a whole, claim 1 simply recites the abstract idea of incentivizing an end user to acknowledge the receipt of a message as implemented in the technical environment of computer networking.

Finally, Network Apparel contends that the claims are patentable in light of the Federal Circuit's decision in *DDR Holdings*. At the hearing, Network Apparel argued that:

[The '079 Patent] was the solution to a problem that terminating users for lack of responding to a message such as in the case of nonpayment had all sorts of problems associated with it. We want to modify rather than terminate. This system, as claimed, allows you to do that. It is a solution specific to or again, quoting *DDR*, rooted in the computer technology. Not something merely implemented by it.

Tr. at 74. The Court disagrees.

In holding that the patents at issue supplied an inventive concept, the court in *DDR Holdings* emphasized that the claims provided an Internet-based solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. *DDR Holdings* did not, however, hold that *all* claims directed to solving a problem "necessarily rooted in computer technology" constitute patent-eligible subject matter. *See Intellectual Ventures II*, 2015 WL 1941331, at *10. Indeed, the Federal Circuit in *DDR Holdings* cautioned that "not all claims

purporting to address Internet-centric challenges are eligible for patent." *DDR Holdings,* 773 F.3d at 1258. The problem in *DDR Holdings* was one that did not arise in the "brick and mortar" context and did not exist before the emergence of Internet commerce. *Id.* By contrast, the problem addressed by the '079 Patent is not one "specifically arising in the realm of" computer technology. As the examples above demonstrate, the problem of incentivizing an end user to acknowledge the receipt of a message *did* exist in the "brick and mortar" context and longstanding practices to address that problem predate the Internet. The '079 Patent claims systems and methods of solving this long-standing problem within the context of computer technology, but the problem itself does not arise from that computer technology. Accordingly, the Court finds Network Apparel's reliance on *DDR Holdings* unpersuasive.

Therefore, the Court finds as a matter of law that claim 1 of the '079 Patent does not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.

*Analysis of Claim 9*

■ Claim 9 fails to supply an inventive concept for many of the same reasons as claim 1. The method of claim 9 consists of six steps. These steps recite: (1) authenticating a uniquely-identifiable device on the limited area network via a "network management device," (2) establishing a first "access rule" for a network device, (3) providing the network device with access to the wide area network according to the first "access rule," (4) sending a message to the network device, (5) limiting the network device's access to the wide area network according to a second, more restrictive "access rule" until a user acknowledges the message, and (6) increasing the network device's level of access back to that provided by the first "access rule."

The majority of these steps, (2)–(6) above, describe the abstract idea of incentivizing an end user to acknowledge the receipt of a message. However, these steps simply implement the abstract idea using, in the context of computer networking, well understood, routine, and conventional activities performed on generic devices.

As discussed above, the claimed "network management device," "limited area network," and "wide area network" are all generic devices or network components that do not supply an inventive concept. The claimed "access rules" also do not supply an inventive concept. As in claim 1, claim 9 fails to recite how the "access rules" are created, how the varying levels of access are provided pursuant to the "access rules," or even how the second "access rule" is more restrictive than the first. In short, the "access rules" of claim 9 lack the specific, concrete application necessary to transform the nature of the claim into a patent-eligible application and, therefore, do not provide an inventive concept. The only step beyond those implementing the abstract idea is: "authenticating a uniquely-identifiable device on the limited area network via a network management device." This step is a well-understood, routine activity in computer networking and does not make claim 9 patent-eligible.

When considered in combination, the steps of claim 9 add nothing that is not already present when considered separately. The majority of the steps simply implement the abstract idea on generic devices using well-known, conventional activity. The remaining step recites an activity routine in the context of computer networking. Viewed as a whole, claim 9 simply implements the abstract idea of in-

centivizing an end user to acknowledge the receipt of a message in the technical environment of computer networking.

▇▇ When considering the steps of claim 9 as an ordered combination, the method of claim 9 comprises the same steps found in the invention of claim 1, but lacks the controller of claim 1. Viewed as a whole, the method of claim 9 comprises a generic computer system that uses a series of steps, specified at a higher level of generality than those of claim 1, to incentivize an end user to acknowledge the receipt of a message by restricting access to a wide area network using a second access rule. To transform an ineligible concept into patent-eligible subject matter, the claims must implement the idea in a precisely defined manner. *See Ultramercial III*, 772 F.3d at 722 (Mayer, J., concurring). The method of claim 9 is not implemented in a precisely defined manner. Accordingly, the Court finds that the invention as a whole does not amount to an inventive concept sufficient to transform the nature of the claimed invention into patent-eligible subject matter.

Considered individually or taken together as an ordered combination, the limitations of claim 9 fail to transform the abstract idea into patent-eligible subject matter because the claimed method simply implements the abstract idea using devices and activities that are well-known, routine, and conventional in the field. Accordingly, the Court finds as a matter of law that claim 9 of the '079 Patent does not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.

*Analysis of Claim 15*

▇▇ Claim 15 also fails to supply an inventive concept. The method of claim 15 consists of nine steps. Six of these steps are the same as those found in claim 9. However, just as in claim 9, these six steps

do not supply an inventive concept because they simply implement the abstract idea using, in the context of computer networking, well understood, routine, and conventional activities performed on generic devices. Further, the "access rules" of claim 15 lack the specific, concrete application necessary to transform the nature of the claim into a patent-eligible application and, therefore, do not provide an inventive concept.

The three additional steps found in claim 15 recite: (1) issuing an end user account for limited area network end users, (2) establishing end user access rules for each end user account, and (3) enabling a messenger to send targeted messages to devices and end users attached to the network. Two of these steps, issuing an end user account and enabling a messenger to send targeted messages, are routine and conventional activities in computer networking and do not make claim 15 patent-eligible. The remaining step, "establishing end user access rules," also fails to supply an inventive concept due to its lack of the specific, concrete application necessary to transform the nature of the claim into a patent-eligible application.

When considered in combination, the steps of claim 15 add nothing that is not already present when considered separately. The majority of the steps simply implement the abstract idea on generic devices using well-known, conventional activity. The remaining step recites an activity routine in the context of computer networking. Viewed as a whole, claim 15 simply implements the abstract idea of incentivizing an end user to acknowledge the receipt of a message in the technical environment of computer networking.

When considering the steps of claim 15 as an ordered combination, the method of claim 15 comprises the same steps as the

method of claim 9, but with three additional steps. The steps of issuing accounts to end users on a limited area network, establishing access rules for end user accounts, and enabling a messenger to send targeted messages to devices and end users attached to the network are well-understood, routine, conventional steps that are necessary to implement the other six steps of claim 15. Adding routine additional steps does not transform an otherwise abstract idea into patent-eligible subject matter. *Ultramercial III*, 772 F.3d at 716. Viewed as a whole, the method of claim 15 still only comprises a generic computer system that uses a series of steps, specified at a high level of generality, to incentivize an end user to acknowledge the receipt of a message by restricting access to a wide area network using a second access rule. Therefore, the Court finds that the invention as a whole does not amount to an inventive concept sufficient to transform the nature of the claimed invention into patent-eligible subject matter.

Therefore, considered individually or taken together as an ordered combination, the limitations of claim 15 fail to transform the abstract idea into patent-eligible subject matter because the claimed method simply implements the abstract idea using devices and activities that are well-known, routine, and conventional in the field. Accordingly, the Court finds as a matter of law that claim 15 of the '079 Patent does not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.

*Analysis of the Dependent Claims*

The dependent claims of the '079 Patent consist of claims 2–8 of the system claims and claims 10–14 and 16–19 of the method claims. To escape invalidity, the dependent claims must "offer [ ] a meaningful limitation" over the abstract idea claimed by the independent claims. *Alice*, 134 S.Ct. at 2360. The dependent claims fail to do so.

Claims 2–8, 12, 14, 17, and 18 all recite limitations that are merely well understood, routine, and conventional activities performed on generic devices that only limit the claims to a particular technological environment. *See Alice*, 134 S.Ct. at 2358 ("patenting abstract ideas cannot be circumvented" by "generic computer implementation" or "by attempting to limit the use of [the idea] to a particular technological environment"). For example, claims 4, 6, and 7 merely recite that the wide area network can be a "worldwide computer network," an "audiovisual network," and a "telephone service network," respectively. Similarly, claims 17 and 18 recite that "providing access to a wide area network" could include a plurality of wide area networks, including data and audiovisual networks. These limitations do no more than recite generic networks in order to apply the abstract idea in a particular technological environment. Claim 2 provides that the "controller" is connected to the "network management device" via a wide area network. Connecting devices is the most fundamental attribute of a wide area network and the inclusion of this element does not add a meaningful limitation to the independent claim. Claims 3, 5, and 8 merely recite that the "device unique attribute" can be a MAC address, an end user Identification Module (SIM), or an end user account. These well-known identification attributes do not add an inventive concept. Claims 12 and 14 recite the same limitations previously addressed as part of claim 15, specifically issuing end user accounts, establishing end user access rules, and enabling a messenger to send targeted messages. As above, these limitations fail to supply an inventive concept because they are routine, conventional activities in

computer networking and do not recite a specific, concrete application.

The remainder of the dependent claims—claims 10, 11, 13, 16, 19—also do not supply an inventive concept. Like limitations discussed above in the independent claims, the limitations added by these dependent claims lack the specific, concrete application necessary to transform the nature of the claim into a patent-eligible application. For example, claim 10 recites including a time-delay between sending the message and limiting the access. Claims 11 and 16 recite reestablishing the wide area connection pursuant to a third "access rule" prior to reestablishing the connection pursuant to the first "access rule," where the third "access rule" is less restrictive than the first. Finally, claims 13 and 19 recite that the "reestablishing the network connection" step comprises "altering the rules for the end user account" for a predetermined time. However, these claims fail for lack of specificity. What is missing, again, is the "how." The limitations do not explain how the third "access rule" is created, how the third "access rule" is less restrictive than the first, or how the rules are altered for the end user account. In short, they fail to implement the abstract idea "in a *precisely defined* manner" that "offer[s][ ] a meaningful limitation" over the abstract idea in the independent claims. *Ultramercial III,* 772 F.3d at 722 (Mayer, J., concurring) (emphasis added); *Alice,* 134 S.Ct. at 2360.

Therefore, the Court finds as a matter of law that the dependent claims of the '079 Patent fail to supply an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.

### D. Preemption Inquiry

United States Supreme Court jurisprudence makes clear that the rationale for excluding laws of nature, natural phenomena, and abstract ideas from patentability is the concern of preemption. *See Alice,* 134 S.Ct. at 2354. " '[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo,* 132 S.Ct. at 1293). In analyzing whether a patent is preemptive, the Supreme Court has stated that the relevant question is "how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo,* 132 S.Ct. at 1303. The concern recognized by the Supreme Court is that "patent law not inhibit further discovery by improperly tying up the future use of" "the basic tools of scientific and technological work" which the Court has recognized to be the basic "building blocks of human ingenuity." *Alice,* 134 S.Ct. at 2354. Although much of the preemption analysis is subsumed in the two-step *Mayo/Alice* analysis, it will also be addressed separately by the Court. *See Open Text S.A. v. Box, Inc.,* 78 F.Supp.3d 1043, 1049 (N.D.Cal.2015) ("the "preemption concern . . . is [ ] baked into the *Mayo/Alice* test").

In determining "how much future innovation is foreclosed relative to the contribution of the inventor," a claim need not tie up the entire field to be preemptive, rather the concern is whether the claim "tie[s] up too much future use" of the abstract idea. *See Mayo,* 132 S.Ct. at 1302. In other words, the "pre-emption inquiry focuses on whether the patent "would risk disproportionately tying up the use of the underlying ideas.' " *Cloud Satchel, LLC, v. Amazon.com, Inc.,* 76 F.Supp.3d 553, 565 (D.Del.2014) (citing *Alice,* 134 S.Ct. at 2354; *Mayo,* 132 S.Ct. at 1294).

Network Apparel asserts that the '079 Patent poses no risk of preemption as follows:

> [T]he '079 Patent claims cover (are "directed to") specific processes ("identifying"), using specific components ("network managing device"), achieving specific parameters ("access rules") ... The '079 Patent claims are fully consistent with the *Alice* Court teachings and are "directed to" a specific implementation of processes and apparatus, in specific ways, and according to specific parameters to thereby merely integrate into a patentable invention, not impermissibly take from the public the whole of *any* "building block of human ingenuity."

Pl.'s Resp. at 18. However, the claims of the '079 Patent are not as specific as Network Apparel would like to believe. As discussed above at length, the claims merely implement the abstract idea using activities that are well known, routine, and conventional in the field and are without the type of concrete application that could satiate the concern of preemption. The addition of generic devices to the claims does no more than limit the use of the abstract idea to a particular technological environment. In this case, it is clear that neither the system nor method claims, considered individually or taken as an ordered combination, impose any significant limitation on the abstract idea and, therefore, disproportionately tie up the future use of that idea.

In fact, the Specification of the '079 Patent makes clear the breadth of its application and the potential for an overly broad application that risks impermissibly preempting future uses of its purpose. *See* '079 Patent at Col. 3, ll. 16–30 ("[I]t is to be understood that the invention is not limited in its application to the details of construction and to the arrangements of the components set forth in the following description or illustrated in the drawings. The invention is capable of other embodiments and of being practiced and carried out in various ways."). *Id.* at ll. 22–28. The specification states that the "system and method of messaging and obtaining message acknowledgement on a network has a wide variety of uses." Col. 7 at ll. 11–14. The specification sets forth a wide variety of applications the claims may cover: 1) "a administrative authority, such as a network service provider, building management company, neighborhood association, campus administration or government entity, could use the invention to provide specific reminders of payments prior to discontinuation" 2) Another administrative authority, such as a college coach or dorm manager, could use the system to conduct a curfew check or issue bulletins" 3) "A Network administrator could also use the system to shunt and warn of inappropriate network use ... contrary to network policy" 4) "Advertising and promotions could also be conducted using the system by altering limitations." *See id.* at ll 14–44.

Network Apparel itself admitted that the '079 patent has a "pretty broad application" Tr. at 40:24–41:2 and would cover such broad uses as ordering a movie off a cable network and acknowledging a message to pay for the movie. *Id.* at 41:3–13. For the reasons discussed, this patent is impermissibly pre-emptive and mandates a finding of invalidity.

## IV. Conclusion and Recommendations

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) be **GRANTED** and that this matter be **DISMISSED**. The undersigned further **RECOMMENDS** that all pending motions be denied as **MOOT**.

The parties may wish to file objections to this Report and Recommendation. A party filing objections must specifically

identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir.1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 150–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc). To the extent that a party has not been electronically served by the Clerk with this Report and Recommendation pursuant to the CM/ECF procedures of this district, the Clerk is directed to send such party a copy of this Report and Recommendation by a national overnight delivery service having confirmation of pickup and delivery.